UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STACEY DUCKER a married woman, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) No. 1:12-cv-01596-SEB-DML |
| DEVANG AMIN, | ) |
| | ) |
| Defendant. | ) |

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause comes before the Court on Defendant Devang Amin's Motion for Summary Judgment [Docket No. 40], filed on August 29, 2013 pursuant to Federal Rules of Civil Procedure 56. For the reasons set forth below, the motion is GRANTED.

### Factual Background

Plaintiff Stacey Ducker, a resident of Georgia, is a former employee of Best Western International ("BWI"), a worldwide hotel chain. Compl. ¶ 6. Unlike most franchise-based organizations of its type, BWI is a non-profit corporation. Hotels within the chain are individually owned and operated, and are referred to as BWI "members." Def.'s Br. 2, ¶¶ 2–4. The corporation's Board of Directors consists of BWI members, each representing a geographic district; the director for each district additionally appoints a group of "governors" (also BWI members) to oversee operations in that geographic area. *Id.* In 2006, after twelve years with the company, Ducker left her position at BWI and started her own company, Sapphire Sales Solutions, LLC ("Sapphire Sales"). Sapphire Sales works as an independent contractor providing consultation services to hotels. Compl. ¶ 6.

1

In 2007, Sapphire Sales entered into a two-year agreement with BWI to provide "on-boarding" consulting services to new and existing Best Western member hotels. This contract was renewed in 2009 and 2011, each time for an additional term of two years. Def.'s Br. 4, ¶¶ 10, 11. As part of Sapphire Sales's contract with BWI, Plaintiff was party to a Confidentiality Agreement authorizing Sapphire Sales and its employees to possess certain BWI confidential information and trade secrets. Pl.'s Resp. ¶ 3.

Defendant Devang Amin, a resident of Franklin, Indiana, owns and operates three Best Western hotels, making him a member of BWI. At the time these events took place in 2012, Amin was the chairman of BWI's Board of Directors and the director of BWI's "District III"—an area covering most of the American Midwest and Ontario. Def.'s Br. ¶¶ 5–6. On March 23, 2012, Ducker sent Amin an email seeking to arrange a personal meeting so that she could discuss her concerns about the amount of business being given her company under its contract with BWI. Pl.'s Resp. ¶ 4. Amin agreed to meet her in Atlanta, which he was visiting for a conference, on March 25, 2012. According to Ducker, she began the conversation, as she had planned, by discussing Sapphire Sales's work with BWI—specifically, her feeling that Wendy Ferrill, BWI's Managing Director of Worldwide Sales, was withholding consulting work from Sapphire. *Id.* at ¶ 5.

However, the conversation between Amin and Ducker then veered in an unexpected direction. Apparently prompted by Ducker's mention of a grievance against Ferrill, Amin began to lay out his own theory that Ferrill was perpetrating a fraud against BWI by falsifying the Request for Proposals (RFP) figures. *Id.* at ¶ 6. In order to gather hard proof of the malfeasance, Amin told Ducker he wanted to see a "raw" copy of the company's internal report on the number of incoming RFPs—if he requested the report through normal channels, he anticipated he would

get a "watered down version of the truth." Compl. ¶ 9. As a *quid pro quo*, Amin asked Ducker to procure a copy of the RFP report from Andre Worthy, a BWI employee who had access to the information and with whom Ducker was acquainted; in exchange, he would exercise his efforts as the board chairman to address Ducker's concerns about BWI providing Sapphire with insufficient consulting business. Pl.'s Resp. 5. After the meeting, Ducker had her daughter (also a Sapphire Sales employee) send Amin the report as requested, along with a cover letter highlighting what Ducker viewed as improprieties demonstrated by the report's figures. *See* Def.'s Br. 5–7.

Two days later, on March 27, 2012, Amin and two other BWI directors asked to meet with Andre Worthy in a hotel room. After asking Worthy to explain the significance of the data that Amin had obtained through Worthy and Ducker, Amin and the other two directors promised to "protect" Worthy from any recriminations for having come forward. Compl. ¶ 13. Strengthened by the meeting with Worthy in his conclusion that the RFP data showed that the company was being defrauded by employees in its sales department, Amin said he would "conduct his own investigation" before reporting to the CEO. *Id.* Indeed, Amin did not bring this information to the attention of BWI CEO David Kong until May 21, 2012. Def.'s Br. 7, ¶ 17.

After hearing of Amin's allegations, BWI launched an official inquiry into the discrepancies in the RFP numbers. At the same time, however, the company conducted an internal investigation concerning whether the behavior of Amin and the two other directors in surreptitiously obtaining the data violated BWI's by-laws and their duties as directors. *Id.* at ¶ 18. When the company's general counsel interviewed Amin as part of this investigation, Amin did not divulge the sources of his information; instead, he "told a story" about having been given the report by an unidentified employee who had flagged him down in a parking lot. *Id.* at 8, ¶ 20.

Two days before this interview, Amin had spoken on the phone with Ducker. During their phone conversation, he related to her his plan to lie to the general counsel, explaining that he felt he needed to protect the identities of the "whistleblowers." Ducker claims that during this phone conversation she urged him simply to tell the truth, but he declined to do so. Pl.'s Resp. 8. Several weeks later, in a phone conversation that Ducker recorded, Amin discussed the results of his interview with the BWI general counsel and confirmed that he had fabricated a story about the source of his information. *Id.* at 9 (citing Docket No. 1-3 at 18–21).

Despite Amin's attempts at misdirection, BWI general counsel Lawrence Cuculic eventually determined that Ducker and Worthy had been Amin's sources. *Id.* at 9, ¶ 25. In a report on the matter that he delivered to the BWI board of directors as a whole, Cuculic stated: "There is reasonable cause to believe that on or about March 24, 2012, Mr. Amin directed an unauthorized third party, who had no authority to act in accordance with Best Western's bylaws, to obtain a copy of the [report], a document that contains trade secret and confidential business information. *Id.* at 10, ¶ 27 (citing Pl.'s Ex. G). After the board heard this report, three board members—Beth Campbell, Jay Patel, and Julie Montmaneix—sent an email to the Best Western members in their respective districts that apprised them of the results of the investigation; attached to the email were the minutes of the board meeting at which the general counsel's report had been discussed.

In this email, sent on October 4, 2012, the directors did not name Ducker as the source of Amin's information, instead referring to a "third party" who "has a service contract with [BWI]." Def.'s Br. 9 (citing Docket No. 1-1). It described Ducker's initial conversation with Amin on March 25, 2012, as follows:

4

> During this discussion, Mr. Amin agreed to speak to Mr. Kong about her contract—the amount of work being sent to her company (she alleged not enough) and the speed with which she is being paid (she alleged not quickly enough). She has represented to [BWI] through her attorney that Mr. Amin stated "I will do this for you if you do this for me." According to the third party, her improperly obtaining the report was "quid pro quo" for his complaining to Mr. Kong on her behalf about her contract.

Docket No. 1-1 at 4. From this email, Ducker's friend Brian Blinn, who received the message in his capacity as a BWI member, was able to deduce that the "third party" referred to was in fact Ducker. Pl.'s Resp. 11; Def.'s Br. 10. He was the only person who ever came forward to her discussing the possibility that she was the third party named in the directors' October 4 email.

Four days later, and on the advice of his attorney, Amin responded to the other board members' allegations by sending an email of his own—this one directed to the "governors" within his district and several other members of the BWI board. Def.'s Br. 10. In his email, he stated:

> [I]n late March of this year, a whistleblower contacted me to inform me that the RFP numbers were exaggerated and inflated, and that inappropriate bonuses had been paid based on the exaggerated RFP numbers.
>
> I was initially very skeptical of this claim, but I promised to protect the identities of the individuals who came forward. And on this point I'd like to be clear – I will always do my utmost to protect the identity of anyone who comes forward to me with any concerns about any aspect of Best Western or its team . . . .
>
> The whistleblower showed me four pages from what is called a PACE Report, a report that I had never even heard of before that . . . . The printed sheets were difficult to read, so I requested an electronic version, after which I, along with Directors James Cosgrove and Jay Patel, met with one of the whistleblowers on March 27, 2012 to better understand what I had been told . . . .
>
> [After the official investigation had begun,] I asked Mr. Kong if he could assure me that Best Western would not retaliate against the whistleblowers, but he said he was unable to provide this assurance . . . . I foolishly agreed to the whistleblowers' request that I try to redirect the investigation away from them by stating I had obtained the information from an unknown person . . . .

5

> Ultimately . . . Best Western learned the identity of the two whistleblowers. When Best Western's general counsel questioned one of these individuals, he agreed that the RFP numbers were misleading, but claimed that I directed him to hide his involvement in this affair. The other whistleblower, who has refused to be interviewed, claims through her attorney that I asked her to provide me with the PACE report and that I informed her of the misleading RFP numbers. . . .

Docket No. 1-2 at 2–4. The full message was just over three pages long, and its evident purpose was to justify Amin's own actions. It mentioned neither Ducker nor Worthy by name, nor did it offer any identifying details about them other than that one was male and the other female. *See* Def.'s Br. 13, ¶ 33. Ducker, who as a non-member was not a recipient of the email, found out about the email from her friend Blinn. *Id.* at 13–14, ¶ 36.

By the time Amin sent his October 8 email, Ducker no longer had a business relationship with BWI. On April 19, 2012, BWI notified Ducker that it was taking its "on-boarding" training program in-house, and that it was terminating its contract with Sapphire Sales. Pl.'s Resp. 7, ¶ 18.[1] During their phone call in June 2012, Ducker confirmed to Amin that she no longer had a relationship with the company. *Id.* at 8, ¶ 20.

Ducker filed a Complaint in this Court on October 31, 2012, against Devang Amin and his wife Bhavna Amin. *See* Docket No. 1. On November 27, 2012, the Court acknowledged the parties' stipulated dismissal of Bhavna Amin as a defendant. Docket No. 16. Defendant Devang Amin moved for summary judgment on August 29, 2013. *See* Docket No. 40.

## Legal Analysis

### Standard of Review

Summary judgment is appropriate on a claim if the moving party can show that there is no genuine dispute as to any material fact, leaving him entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of

---
[1] Ducker has initiated a separate contract dispute with BWI in the United States District Court in Arizona. *See* CV12-1538-PHX-ROS, *Sapphire Sales Solutions, LLC v. Best Western International, Inc.* (cited in Compl. ¶ 22).

summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the Amere existence of some alleged factual dispute between the parties,@ *id.*, 477 U.S. at 247, nor the existence of Asome metaphysical doubt as to the material facts,@ *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Here, the Defendant as the moving party Abear[s] the initial responsibility of informing the district court of the basis for his motion," and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Because Plaintiff, the non-moving party, will bear the burden of proof at trial, Defendant may discharge his burden at this stage of the proceedings by showing an absence of evidence to support Plaintiff's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to

establish his or her case, summary judgment is not only appropriate, but mandated. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element Anecessarily renders all other facts immaterial.@ *Celotex*, 477 U.S. at 323.

## Discussion

Plaintiff Stacey Ducker brings two claims, both based entirely on Defendant Devang Amin's October 8, 2012 email to certain BWI members and fellow directors. First, she claims that the email constitutes defamation. Her second claim alleges "false light publicity," a branch of the tort of invasion of privacy. Because we exercise diversity jurisdiction over these state-law claims, we apply Indiana law to all substantive issues. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010).

### I. Defamation

A statement is defamatory if it "tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." *Lovings v. Thomas,* 805 N.E.2d 442, 447 (Ind. Ct. App. 2004) (citing *Ratcliff v. Barnes,* 750 N.E.2d 433, 436 (Ind. Ct. App. 2001)). Under Indiana law, a plaintiff must prove the following elements in order to prevail on a defamation claim: "(1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." *Id.* Additionally, the communication in question must not be only defamatory, but false. *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006); *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 687 (Ind. 1997).

In his motion for summary judgment, Defendant raises three arguments against the claim: that it lacks defamatory imputation because it does not identify the plaintiff, that Defendant lacked malice in sending the email, and that Plaintiff can show no damages. Def.'s Br. 18.

8

Because we conclude that Defendant's email did not identify Plaintiff and thus neither possessed defamatory imputation nor caused Plaintiff cognizable damages, we grant Defendant's motion. *See Haire v. Parker,* 957 N.E.2d 190, 195 (Ind. Ct. App. 2011) (noting that summary judgment is warranted where a plaintiff fails to establish an element of the cause of action).

## A. Defamatory Imputation

### 1. Legal Standard

The first element of the defamation cause of action carries with it an essential corollary: the communication must be one concerning the plaintiff. "Defamatory words are not actionable unless they refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258, 261 (Ind. 1994) (citing *Lee v. Weston,* 402 N.E.2d 23, 30 (Ind. Ct. App. 1980)). Courts can ordinarily resolve this question as a matter of law, and in doing so, they look to the clear meaning of the communication itself. *See Ratcliff,* 750 N.E.2d at 436. In *Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223 (Ind. Ct. App. 2005), the Indiana Court of Appeals held: "When determining whether a statement was defamatory, we may not consider extrinsic facts or circumstances; rather we must simply view the communication in its context and give it its plain and natural meaning." 827 N.E.2d at 1230; *see also LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, 2010 WL 2608342, at *2 (N.D. Ind. June 25, 2010).

In her response, Plaintiff contends that Indiana law permits resort to extrinsic evidence to determine whether Defendant's email refers to her. In doing so, she makes two key interpretive errors. First, she contends that the language of the *Cortez* decision is inapposite, because it refers only to the distinction between defamation *per se* and defamation *per quod.* See Pl.'s Resp. 21 n. 4 ("To be defamation per se, the defamatory nature of the comment must appear without

9

reference to extrinsic facts or circumstances.") (quoting *Cortez,* 827 N.E.2d at 1230). Plaintiff has simply mistaken one part of the *Cortez* decision for another—interpreting two wholly compatible quotes from the decision as being mutually exclusive. Taken together, the court's two statements establish the following: the defamatory nature of a statement must be resolved without resort to extrinsic evidence; further, a defamatory statement only qualifies as defamation *per se* if its status as such is clear without extrinsic evidence. *See Cortez,* 827 N.E.2d at 1230.

Second, Plaintiff cites a comment to the Restatement (Second) of Torts § 564 for the following proposition:

> It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. *Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody.*

Pl.'s Resp. 19 (quoting Restatement (Second) of Torts § 564, cmt. b (1977)) (emphasis Plaintiff's). Plaintiff then points to a series of decisions—none from Indiana—incorporating the language of this section of the Restatement. As Defendant points out, however, Section 564 of the Restatement applies to a situation not present here—namely, when the communication's recipient mistakenly, but reasonably, believes that it refers to him. *See* Restatement (Second) of Torts § 564 cmt. b. (the comment's title is "person mistakenly but reasonably believed to be intended"). Here, Defendant does not deny that the "whistleblowers" of his email are in fact Worthy and Plaintiff; he maintains, rather, that the document itself warrants no such link. At any rate, we are aware of no Indiana cases that adopt this portion of the Restatement, and Plaintiff's string of foreign cases is not persuasive. We conclude as a matter of law that the email identifies the Plaintiff only if the four corners of the document itself warrant such an interpretation.

### 2. Content of the Email

Indiana law does not provide detailed guidance to courts in determining whether an allegedly defamatory communication identifies the plaintiff as its target. The Indiana Supreme Court laid the broad foundations of a standard in a decision dating to the antebellum era, holding that "[i]f it be uncertain of whom the words were spoken, the action is not maintainable." *Harvey v. Coffin,* 5 Blackf. 566, 568 (Ind. 1841). In accordance with that standard, the court concluded that a statement referring only to "my brother"—when the defendant had more than one—could not be defamatory. *Id.* In much more recent times, the Northern District of Indiana analogized to *Harvey* in holding that where a series of articles referred to residents of a neighborhood but identified no one in particular, it could not be defamatory. *Gintert v. Howard Publ'ns, Inc.*, 565 F. Supp. 829, 832–833 (N.D. Ind. 1983). "The articles are referring to residents of [the area] in general and as such there is no way to be certain against which, if any, individual any of the language is directed." *Id.*

According to any reasonable application of this broad standard, Defendant's email does not identify plaintiff on its face. It provides neither her name, her occupation, her residence, nor any other distinguishing features other than her gender.[2] Without recourse to extrinsic evidence, a reasonable BWI member reading the email would have no idea to whom it referred. Even *with* the extrinsic evidence Plaintiff seeks to apply to the email, it is far from clear that a reader without special insight would be able to deduce the document's connection to Plaintiff. As Plaintiff points out, the October 4 email from other BWI board members (to a largely different audience, but apparently with some overlap) did refer to one of the whistleblowers as a female BWI contractor who met with Amin in Atlanta. *See* Pl.'s Resp. 20 (citing Docket No. 1-1 at 4).

---

[2] Even at that, a reasonable reader would have no way of knowing whether Plaintiff was the male whistleblower mentioned or the female.

Even if Plaintiff's friend Brian Blinn was allegedly able to conclude from the October 4 email that Plaintiff fit that description, it is difficult to imagine that a reasonably well-informed BWI member, viewing the two documents side by side, would be "certain" that they applied to Plaintiff. *Cf. Gintert,* 565 F. Supp. at 832–833. Such analysis is superfluous, however. Indiana provides that if a document does not defame the plaintiff according to its "plain and natural meaning," then it gives rise to no cause of action. *See Cortez,* 827 N.E.2d at 1230. Plaintiff thus falls short of establishing the first, quintessential element of a defamation claim.

**B. Causation and Damages**

Although the failure to satisfy any element of the claim warrants summary judgment, we briefly address Defendant's additional argument that Plaintiff "cannot demonstrated that the October 8, 2012 email was a proximate cause of her alleged damaged reputation and purported inability to find alternate work." Def.'s Br. 22. We agree with Defendant that this deficiency is an independent basis for summary disposition.

Unless the communication at issue is defamation *per se*, the plaintiff must plead and prove "special damages"—defined as those "that are pecuniary in nature and that have been actually incurred as a natural and proximate cause of the wrongful act." *Moore v. Univ. of Notre Dame,* 968 F. Supp. 1330, 1335 (N.D. Ind. 1997) (applying Indiana law) (citing *Tacket v. Delco Remy Div. of Gen. Motors Corp.*, 937 F.2d 1201, 1206 (7th Cir. 1991)). Physical and emotional damages are only recoverable if "attached" to pecuniary damages. "Emotional and physical harms are not special damages unto themselves, but rather are parasitic damages, viable only when attached to normal (i.e. pecuniary) special damages." *Lovings,* 805 N.E.2d at 448.

Here, Plaintiff has demonstrated no affirmative causal link between any of the pecuniary damages she claims to have suffered and the allegedly defamatory email from Amin.[3] BWI terminated her consulting contract in April 2012—several months before Amin's October 8 email. Pl.'s Resp. 7, ¶ 18. In her deposition, Plaintiff concedes that she can make no direct link between the email and a loss of employment opportunity or other pecuniary benefit. Def.'s Ex. E at 76–78. She does allege that in a conversation with a friend, she learned that Magnuson Hotels did not want to speak with her "because of the litigation that was going on"[4]—but that conversation took place on October 6, two days before Amin sent his email. *Id.* at 77–78; 90.[5] Her friend Brian Blinn is the only person she alleges ever contacted her about the Amin email, but she does not allege that she suffered any damages as a result of Blinn deducing from multiple sources that she was the whistleblower mentioned in the email. Def.'s Br. 23. Without showing that the email itself—rather than the controversy in general, or even an entirely unrelated change in business fortunes—caused her alleged pecuniary damages, Plaintiff has failed to meet her evidentiary burden.

In her response, Plaintiff does not dispute the absence of special damages; rather, she argues that the Amin email was defamation *per se*. Pl.'s Resp. 23. A communication qualifies as defamation *per se* "when the language of [the] statement, without reference to extrinsic evidence, constitutes an imputation of (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a

---

[3] Plaintiff's statement of damages recites that (1) her Sapphire Sales income dropped from $300,000 in 2011 to $0 in 2013; (2) she failed to get an anticipated contractor deal with Choice Hotels; (3) she applied for 60 jobs and only received 2 responses; (4) organizations have stopped asking her to present at functions, despite her extensive experience; and (5) the owner of Magnuson Hotels will not speak to her about consulting work because of the "Amin litigation." Def.'s Ex. G at 3–4.

[4] Plaintiff contends (illogically, because the conversation took place two days before the email was sent) that this comment refers to the email, but the more plausible reading is that it refers to the suit that Plaintiff had already filed against BWI in federal court in Arizona. *Cf.* Def.'s Ex. E at 89–90.

[5] Defendant argues, and Plaintiff admits in her deposition, that the information from Magnuson, relayed by a third party, is "hearsay." Def.'s Ex. E at 77–78. Because we find that Plaintiff fails to satisfy her burden of showing damages anyway, we need not consider Defendant's contention that the information is inadmissible.

13

person's trade, profession, office, or occupation, or (4) sexual misconduct." *Dugan v. Mittal Steel USA, Inc.*, 929 N.E.2d 184, 186 (Ind. 2010) (citing *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007)). With respect to one of these four subjects, the statement in question must "constitute 'a serious charge of incapacity or misconduct in words so obviously and naturally harmful that proof of their injurious character can be dispensed with.'" *Moore,* 968 F. Supp. at 1334 (quoting *Schrader*, 639 N.E.2d at 258). If defamation *per se* is established, then damages are presumed and the plaintiff need not plead special damages with particularity. *Dugan*, 929 N.E.2d at 186 (citing *Rambo,* 587 N.E.2d at 145–146).

Read on its own terms, the Amin email does not obviously impute to Plaintiff misconduct in her trade or profession.[6] Although the email (falsely, according to Plaintiff) relates that the whistleblowers requested that "Amin try to redirect the investigation away from them," it does not accuse either of the two unnamed whistleblowers of misconduct—in fact, the opposite is true. Docket No. 1-2 at 2. In the message, Amin explains his decision to conceal the whistleblowers' identity, in part, as follows: "The law[] and common sense tell us that whistleblowers should be protected, not punished. In my hotels and other businesses, I welcome any employee to come forward with concerns he or she may have about anything that may harm the business." *Id.* at 3. Neither is the term "whistleblower," taken by itself, obviously and inherently defamatory. Plaintiff cites Roget's Thesaurus for the proposition that synonyms of the term include "informer," "snitch," "tattletale, and "rat." Pl.'s Resp. 24. However, the term's meaning in the business context is at most equivocal, and it is hardly an unambiguous professional epithet. Black's Law Dictionary defines a "whistleblower" only as "an employee who reports illegality to a governmental or law enforcement agency," and notes that "federal and

---

[6] Leaving aside the fact that, as previously discussed, the email does not impute to *Plaintiff* anything, since it does not identify her.

14

state laws protect whistleblowers from employer retaliation." *Black's Law Dictionary* 1590 (7th ed. 1999). Even if a "whistleblower" in other contexts may be an object of scorn or displeasure, Amin did not employ the term as such in his email. *See McQueen v. Fayette Cnty. Sch. Corp.*, 711 N.E.2d 62, 65 (Ind. Ct. App. 1999) (to constitute defamation *per se,* defamatory nature of the words must appear without resort to any circumstances outside the four corners of the communication). Nor does the word carry with it such an ironclad derogatory meaning that a reader would inevitably view the email as a whole as an attack on Plaintiff's integrity. A plaintiff has a high bar to meet in showing that a communication unambiguously accuses him or her of professional misconduct. *See, e.g.*, *Levee v. Beeching,* 729 N.E.2d 215, 220 (Ind. Ct. App. 2000) (statement that a fellow employee was a "liar" is not defamation *per se* without resort to extrinsic evidence to reveal the magnitude of the alleged misconduct). Here, Plaintiff has not met that burden, even if she could show that the email identifies her in the first place.[7] Based on these two grounds, either of which would be sufficient to defeat the claim, we grant Defendant's motion for summary judgment on the defamation claim.

## II.    False Light Publicity

Plaintiff's second claim is for false light publicity, a common law tort recognized by the Indiana courts as a type of actionable invasion of privacy. Defendant's motion for summary judgment argues that the claim fails because it was not "publicized," and because the light in which Amin's October 8 email placed Plaintiff was not "highly offensive to a reasonable person." Def.'s Br. 28–29. Without reaching these arguments, we conclude that summary judgment is warranted for a more fundamental reason: the email does not say anything at all to a reasonable reader about Plaintiff, because it does not identify her.

---

[7] We do not reach Defendant's third alternative argument that he did not act with the requisite "malice" when sending the email.

The tort of invasion of privacy in Indiana has been held to encompass "four distinct strands": (1) unreasonable intrusion upon the seclusion of another, (2) appropriation of the other's name or likeness, (3) public disclosure of private facts, and (4) false light publicity. *St. John v. Town of Elletsville*, 46 F. Supp.2d 834, 850 (S.D. Ind. 1999); *see also Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind. 1991). The Indiana Supreme Court has defined false light publicity, somewhat tautologically, as "publicity that unreasonably place[s] the other in a false light before the public." *Lovings,* 805 N.E.2d at 447. More helpfully, courts have followed the Restatement of Torts in delineating two elements of the tort: "(1) the false light in which the other was placed would be highly offensive to a reasonable person, and (2) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Branham v. Celadon Trucking Servs., Inc.*, 744 N.E.2d 514, 524 (Ind. Ct. App. 2001) (citing Restatement (Second) of Torts § 652E (1977)).

The torts of false light publicity and defamation are thus nearly parallel in their elements. The chief difference is that they reach "different interests": "defamation reaches injury to reputation; privacy actions involve injuries to emotions and mental suffering." *Branham,* 744 N.E.2d at 524. Like defamation, false light publicity carries with it an implied antecedent requirement: that the communication in question actually refer to the plaintiff. Otherwise, the negative publicity can be neither objectively offensive nor reasonably foreseeable by the defendant. *See* Restatement (Second) of Torts § 652E cmt. b (the tort must involve "highly objectionable publicity that *attributes to him* [plaintiff] characteristics, conduct, or beliefs that are false); *see also* 6 Am. Jur. 3d *Proof of Facts* 585, § 1.7 ("An unstated prerequisite to a cause of action for false light invasion of privacy is that the matter disseminated to the public be demonstrably "about" the plaintiff . . . .").

16

As previously discussed, Amin's October 8 email did not name Plaintiff, nor did it provide any identifying information about her at all other than that either she or her fellow whistleblower were female. *See* Docket No. 1-2. No reasonable reader could possibly have found its depiction of her "highly offensive," since no reasonable reader would know that the email discussed her at all.[8] Because Plaintiff has not satisfied an essential logical precondition to the tort of false light publicity, her claim fails.

**Conclusion**

Both of Plaintiff's claims rest on logical ground that is ultimately too weak to support them: the contention that Amin's email—which revealed about her only the possibility that she might be a female—identified her to a sufficient degree to be actionable on any theory. This deficiency is fatal to both claims, and Defendant's motion for summary judgment is therefore GRANTED as to both claims, and judgment will enter accordingly.

IT IS SO ORDERED.

Date: 3/14/2014

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[8] Although resolving the question is not necessary to our disposition of the case, we also reject Plaintiff's proposed definition of "publicity." Noting that several neighboring states have adopted a more liberal definition of the term which considers a statement "publicized" if disseminated to a highly sensitive peer group (such as coworkers or neighbors) even if not distributed to the general public, Plaintiff urges us to "adopt" such a standard for Indiana law. Of course, we are not empowered to change the Indiana common law; the fact that several other states have changed theirs may be persuasive to the Indiana Supreme Court if they address the matter, but we are bound to follow Indiana's law as it is. The Indiana Supreme Court in *Doe v. Methodist Hospital,* 690 N.E.2d 681 (1997), noted the more expansive minority view, but did not adopt it. 690 N.E.2d at 692–693. For our purposes, then, a statement is not publicized unless it reaches the "public at large," or so many persons that the matter is substantially certain to become public knowledge. *Id.* at 692. Sending an email to a closed group of subordinates does not satisfy this criterion.

Distribution:

Ashley Gillenwater Eade
KIGHTLINGER & GRAY, LLP-New Albany
aeade@k-glaw.com

Crystal Gates Rowe
KIGHTLINGER & GRAY, LLP-New Albany
crowe@k-glaw.com

Richard T. Mullineaux
KIGHTLINGER & GRAY, LLP-New Albany
rmullineaux@k-glaw.com

Tod F. Schleier
SCHLEIER LAW OFFICES, P.C.
tod@schleierlaw.com